11-23-46 Consolidated with 11-26-53 Empire Indemnity Insurance Company v. The City of Chicago Province of Society of Jesus Okay, now we've signed an order granting you extended argument in this case. We're giving the Jesuits 20 minutes as 10 minutes and we're giving the Jesuits then a 10 minute rebuttal. That's acceptable to all of you? We've got lawyers for everybody here? We're going to re-quantify it in a little bit. What are you going to do? Well, this is Michael Grose on behalf of Rhode Island Law. This is still a half hour, but we were just addressing it in a little different sequence that I think might make more logical coherence. That is, I will argue on the expected and intended issues common to all of us. My target is 10 minutes, but it might be more than 10 to 15 minutes. Okay, but I'm only going to give you half an hour. Who's ever last usually winds up cheating. You may want to change your words. No, we understand and we appreciate the court's indulgence, but this may make for a more coherent presentation. Okay, as long as it's a half hour. Go ahead. May it please the court, counsel, my name is Jennifer Turriello. I'm with the law firm of Peterson, Johnson & Murray in Chicago and I'm representing the Jesuits in this appeal. All of the appellee's arguments are attempts to put a square peg into a round hole. Nowhere is this more evident than in their assertions that the John Doe claimants and John Doe and Jane Doe invented their negligence claims so as to manufacture coverage as well as in the arguments that the Jesuits' behavior or alleged behavior can't possibly be characterized as negligence. To be clear, this case does not fit the mold of the appellee's cited authorities on those two fronts. There are several reasons why the trial court's summary judgment orders in the appellee's favor should be reversed. Chief among those reasons where all the appellees, including the umbrella carriers, are concerned is that the underlying allegations contain, or the underlying actions, I'm sorry, contain allegations of negligence. Negligent retention and negligent supervision, specifically. Ms. Turriello, since the briefs have come in, we have noticed from the online dockets of the law division cases and the Arizona federal case, it appears that all the cases have been settled. Is that correct? I believe that is correct. I'm not directly involved in those activities. All right. Well, for the sake of the discussions, let's assume the online dockets are accurate. So the first question is, if you can tell us whose money was used to settle the cases, because that may have relevance in terms of the other issues. I cannot. I was not involved in those settlements. Because usually when we get these kinds of cases, there's an active personal injury case underlying the Chan Street DJ case. But we don't have that anymore. So are we fighting over who's going to pay the attorney's fees for the defense of the law division cases? Is that essentially what this is now all about? Or are we talking indemnification as well? I still believe we're talking about indemnification. Again, I qualify that because I wasn't involved directly in this settlement activity. But I don't believe there were any payments by any of the carriers present today on behalf of the appellees in those settlements. As to some of the appellees, or one of the appellees in particular, first non-profit, they're alleging that for some of these allegations, their policy wasn't enforced at the time of the event. So why shouldn't the summary judgment be appropriate for them as to those counts? There's only one claimant for which that argument applies. Do you concede the argument as to that claim? No, I do not. It's John Doe 117, Your Honor, and their argument is based on the definition of sexual abuse or sexual molestation in their policy. That definition says sexual abuse or sexual molestation is defined as the infliction of harm, whether the harm is physical, psychological, or emotional. They put emphasis on the word inflict to say that the actual physical acts of sexual abuse have to take place within their policy periods in order to trigger coverage. I say the focus of that definition is harm. Harm appears twice. Well, let me, you know, I'm kind of simplistic. If I hit you with my car and your injury doesn't manifest itself for two years, when does the statute of limitations commence running? The day I hit you with my car or the day your injury manifests itself? When you hit me with the car, Judge. Why is this any different? Well, I would, in addition to the arguments, the word inflict versus harm and what's the proper focus, you know, here we're talking about first nonprofits sold the Jesuits sexual abuse or sexual molestation liability coverage. And it's commonplace that victims of sexual abuse don't just suffer injury in the discrete time period in which they're subjected to physical acts of abuse. Absolutely, and there's no question of that. And neither do people get hit by cars, suffer all of their injury at the instant of the event. So I'm trying to come to grips with the fact that you seem to be advocating the proposition that time limits are measured by when the injury manifests itself in view of the fact that we presume with sexual molestation injury is intended. It's, well, injury is intended as to the person who perpetrates the abuse. We'll get to that in a minute. That's another. There's no transfer of intent. We understand your argument to that extent. And my argument is based specifically on this policy language. I'm not saying as a general rule that because people can manifest injuries well beyond when they're hit by the car that, you know, that they should be allowed to seek recovery for those injuries. It's based on this specific policy language and that if First Nonprofit wanted to make it clear that they're only covering if the abuse, the physical acts, take place within that six years that they insured the Jesuits, there was a way to say that. And the way they did it here didn't clearly connote that meaning to the Jesuits. If we were to adopt your interpretation of that particular policy language, what insurance company would write that kind of a policy? Without excluding the priest whose molestation was known. Again, I think there's a way that it could be written to say, you know, the actual physical abuse has to take place within our policy period in order for us to provide coverage. And that just wasn't done here. And again, this is the issue we're talking about right out of the box. It only pertains to John Doe 117. That's it. You know, so I understand. It occurs to me that you're trying to transform an occurrence policy into a claims-made policy. That's exactly what you're trying to do. So, but okay, it's John Doe 117. Let's talk about the rest of it. Okay. The big argument, the one that's really sparked a lot of briefing is the expected or intended injury exclusion. I want to make sure I get a chance to say something about that today. The underlying actions assert potentially covered negligence claims. The underlying actions talk about and allege that the Jesuits were negligent in managing Father Maguire in his role as a priest and a counselor and a teacher. And that the Jesuits were negligent in monitoring his whereabouts and his activities with children. Those allegations do not trigger expected or intended injury exclusion. Now, can I ask you a question? There's a whole series of allegations in these complaints as to when the Jesuits knew this and when the Jesuits knew that and when they were told this and when they were told that. Did the Jesuits ever file an answer to that complaint? To the underlying actions? Yes, they did. I believe they were denied. But again, I'm not the attorney and those aren't part of the record. I have a feeling that they admitted and the other side would have told us and that's a key for them to let us know when they're done. Here's the question that I get. There are cases that say that you look to the underlying complaints. There are other cases that say that you look to the underlying pleadings in the underlying case. Now, if the Jesuit was denied those allegations, then the question becomes, is summary judgment appropriate or is it inappropriate? If there's nothing more than the allegations in the complaint, in an admission or a denial. I think, Your Honor, the point that you're making kind of goes with Peek and V. Wilson. Obviously, it was tossed around. There's been a lot of argument about that. The appellees in the trial court, that was their case. At the point Peek and V. Wilson became an issue, the Jesuits had actually won summary judgment on the duty to defend. The trial judge had decided that the negligence counts did state an occurrence, alleged an occurrence, and that there was enough there to say that there was a duty to defend. Peek and V. Wilson gets decided. First non-profit leads the charge, comes in and says, Peek and V. Wilson, Revolutional Outlaws. That's how we look at duty to defend analysis. Because of that, Judge, you can look at the entire, all the facts in all the pleadings. The Jesuits, as the record shows, kind of opposed that this was a Peek and V. Wilson situation. Because Peek and V. Wilson just talks about looking at extrinsic evidence and other pleadings, like a third-party complaint, in order to assess whether there is a duty to defend. On appeal, I think it was telling that all of the appellees kind of backed away from Peek and V. Wilson, almost conceded that it doesn't apply. And now their key case is the Farmers v. Danner case that came out of the 4th District just in 2012, I believe. I still contend this isn't a Peek and V. Wilson situation, and that nothing in Peek and V. Wilson authorized the court to, when you have negligence counts, or negligence allegations, but alongside allegations of intent and actual knowledge, you've got coexisting types of allegations. There's nothing in Peek and V. Wilson or any other Illinois case that says, I'm going to pick this set of allegations. I'm going to pick those intentional ones. But Westfield does that. I mean, they said, in Westfield, the court said, these are negligence claims cloaked in intentional acts. So there is a similar analysis done there. There's a similar analysis, but I think Westfield is distinguishable from our case. Well, you're going to say that factually. Factually and on the point that you're raising, that there's no possibility that the Jesuit's conduct could be negligent. But I'm having trouble understanding how that makes a difference, that there's negligence versus intentional allegations. There's still that anticipated language in the exclusion. And to me, I just don't know why that would not cover negligence claims. Particularly the negligent claim that is before us, which is, you know, a failure to supervise or a duty to protect the injured parties. And one of the appellees cited a case, the Van Horn case, and it said that the unfitness of the employee must have rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position. Which seems to be similar to what Westfield, how Westfield defines anticipated or expected. So why would intentional versus negligence make a difference? Because where the negligence allegations are concerned, they don't rise or fall on what the Jesuit's intent was towards the John Doe claimants or what the Jesuit's expectations were. The intent component isn't present in the negligence claim, and that's why the negligence claims and allegations take that role and trigger the duty to defend. There's no component in proving the Jesuits were negligent that requires the John Doe claimants to come forth with evidence of intent on the Jesuit's part. Or anticipated. And I mean, the Westfield case, and I know that's been cited by the appellees, it's been cited, you know, the trial court relied on it as well, it's distinguishable definitely on the facts, the Jesuits can't be likened to the spouse in that case. You know, the appellees say, well, in that case, you know, the spouse did exactly what the Jesuits did. She let these kids into her home and didn't tell anybody about her husband's prior criminal conduct. Who gave her a chance to be an assistant? That's what I, absolutely, she was an active participant, and that's part of the ruling. That was the linchpin of the court's decision to hold her basically on par for inferred intent purposes and say, you're no different than the husband here, and you should have reasonably anticipated because of your own conduct that these children were going to be harmed. The second component to the Westfield case that I would distinguish is this notion, you know, that there, in that case, there was no way for the aunt or the spouse's conduct to be characterized as negligence. She was positioning kids on the lap of the perpetrator, she was encouraging kids to watch pornography, she facilitated discussions with the children about pornography, that can't be characterized as negligence, I agree. There is some discussion in the briefs about the evolving nature of the underlying law division complaints. That, toward the end, there were counts added in by the plaintiffs through amendment, which would have more likely been coverable by insurance. Are those the complaints that are actually before the court today? Yes, but there were. Let me be clear on this point as well. That's also what makes this case different from those cases at the Apple East site where the tort victims are accused of conjuring up negligence claims to manufacture coverage or artfully plead their claims. These cases always had negligence allegations running through them. The change that you're referring to was in the initial complaints, all of the facts, the general facts about how the Jesuits had actual knowledge and there was this cover-up, those were incorporated by reference into the negligence counts in the original complaints. On amendment, that was not the case. On amendment, there was no incorporation of those earlier factual allegations. So that's the difference between the original and amended complaints. But again, I want to make clear, from the beginning, there were always negligence claims running around in these underlying actions. The Jesuits contend take this case out of the scope of the expected or intended injury exclusion and trigger a duty to defend. And before you run out of time, I need you to address the issue of the missing portions of the Pennsylvania general policy. Sure. This has been up and down once already. It looks like when it came back to us the second time, no one found any more parts of the policy or at least what they found wasn't still the complete policy. You couldn't find it, Pennsylvania general couldn't find it. So there's a lot of discussion in the briefs about what we do, but let's say, you know, in terms of your own client, you're asking for through discovery from the other side. So where does that leave us in terms of forcing coverage? I'm not the plaintiff in the DEC action who came to the court seeking a declaratory judgment. That's my position. The question here is, this was a summary judgment. Correct. So it's not the question of what you can prove at trial. The question is, was there an issue of fact to be decided that would prevent the summary judgment from being granted? It's not who proved what. True. We're not here to decide the issues. We're merely here to decide if issues exist. So now, I get back to a more basic question. If you have a complaint that in one count alleges willful activity, no, no, no, no, no, coupled with a negligence count that has no allegations of you knew, and there's an answer on file denying the knowledge allegations in the one count. What effect does that have on the ability to grant a summary judgment? The summary judgment should be granted in favor of finding a duty to defend on those facts. Yes, in some instances there were cross motions, yes. From the insurance company's standpoint, should they be able to obtain a summary judgment when there has been a denial of the knowledge allegations in the underlying complaint? No, they should not. What's your best case for that one? I've got two, actually. One is an Illinois decision. It's the Diocese of Juliet versus Interstate case. Now, granted, it is not a duty to defend case. I will tell the court that. It's an indemnification case. But in that case, same fact pattern is what we have here. There were coexisting allegations of negligence, negligence supervision, alongside allegations that the diocese knew that there was negligence. There was a case that the diocese knew about prior instances of abuse by a priest, and in that case, there was an occurrence. It was found to have pled an occurrence. Nobody questioned that. Again, it was an indemnity issue, but no one was questioning the underlying case alleged an occurrence. There's a second case that's also in our briefs. It's the Diocese of Dallas versus Interstate. It's another case where, it's a Texas case, where the same approach. These allegations, coexisting negligence, and all these bad allegations about actual knowledge, prior incidents of sexual abuse by a priest. And again, the finding was, nope, the negligence allegations are enough. They constitute an occurrence. There is a duty in that case as well to indemnify. So those would be my two cases I would cite. I think I'm probably out of time. Thank you. Good morning. May it please the Court. My name is Michael Proe, and I represent Mount Holly Insurance Company and RLI Insurance Company, who are umbrella carriers. I'm addressing some of the common issues of expected and intended that affect all of us, and then counsel with specific issues to their clients will follow me. Had these cases been settled at the time the summer judgment was honored? I cannot tell you for sure the status of the underlying settlements once the... Mr. Duffy says no. I'm sorry, but the summer judgment wasn't part of it. Before the summer judgment? Well, that's true. There were a rolling series of them, and I also do not know who funded them. I can represent to the Court my client was not involved in the funding of those settlements, but I don't know. What evidence was there that was presented to the Court on the new or should have known, other than the allegations in the other counsel? Well, and as you know, Your Honor, of course, Illinois has been and is, for most relevant purposes, here an eight-corner state. That is, you look at the four corners of the complaint and the four corners of the policy. So as far as evidence submitted extrinsic to that, I wouldn't say that any party is relying on extrinsic evidence. I think you would say, you look to the allegations of the complaint to say, if plaintiffs recover, what are plaintiffs seeking recovery for? And if that's an excluded loss, then you can answer that. Well, we understand that the intentional counts would be excluded losses, but on the question of duty to defend, the only thing there has to be is a single count that falls within coverage under the policy. You've got to defend that entire case. And if I can address that, because the question, I think, of intent versus negligence isn't precisely the question here. It's expected. The expected prong of expected and intended. And here, even the negligence claim, as pleaded, as part of an overall coherent complaint that includes fact allegations, is excluded as expected. Under the articulation of expected, under Illinois case law, repeated cases have said, and these are quoted in the briefs, Westfield and Danner and others, that a loss is expected within the meaning of that exclusion. If it can be inferred from the facts that the injury was the natural and probable result of the act, or if the loss is of such a nature, they should have been reasonably anticipated. But I'm back to my basic question. What if they denied all those allegations in their answer? I would say that doesn't matter. The defendant always denies allegations against it in a complaint. And then you're saying that the plaintiff, by the way the plaintiff pleads, can strip the defendant of their rights under an insurance policy. That's not correct. The plaintiff defines what they're seeking recovery under in their complaint. The plaintiff states their facts on which they seek recovery. And this is a question of a liability policy. What is the defendant's liability going to be for? It's going to be for those facts as alleged, if proven at trial. That's understood, of course. I would posit in every case we've read and in every case we've cited, applying duty to defend under Illinois law, the defendant denied liability. Let me ask you a question. Easy, easy. Could a plaintiff in this case recover on a negligence theory if the Jesuits had no knowledge of Mr. McGuire's behavior? Not under these facts as pled, because they do repeatedly plead that the Jesuits, in fact, had or were in receipt. I'd like to get an answer to my question. If these plaintiffs cannot establish or could not establish that the Jesuits knew or should have known of Mr. McGuire's behavior, could they ever recover on a negligence theory or on the negligence theory they've pled? Well, and those are two different questions. I think if we looked at hypothetical negligence claims. Well, let me address the two parts of that. I think the negligence claim, other than the one they've pled, I think it's hypothetical, it's hard to know. The negligence claims they've pled are premised on the receipt of actual knowledge and reports. So in other words, the answer to the question is no, that without the allegations of underlying knowledge, these plaintiffs could not have recovered on their negligence claim. I think under this case, as they've pled their negligence claim, there are repeated allegations of secret settlements, of moving him around, of allowing him to continue access to children. This is not that case where there is some freestanding negligence count that's not premised on actual knowledge. In fact, I think it's hard to make sense. If you somehow isolated and looked at this negligence claim standing alone, it wouldn't make any sense because a duty to warn of what? A duty to protect from what? If they didn't have actual reports, if they didn't have actual knowledge, those are nonsense claims. They're illogical. Well, the negligence claims, at least on a couple of the complaints that I looked at, said it's reasonably known based on the numerous reports. And I think it's a little cute to say we drop the incorporation. Silently we're going to drop Plaintiff Incorporates paragraphs 1 through 38 of the complaint, and you drop that. And then instead you just read on and the complaint just reads on. I don't think there's a judge in the world that wouldn't say that those facts are still in the case. They certainly aren't disavowing those facts. They certainly aren't stepping back from them and saying, oh no, it was all just a big accident. Those facts are still there. They're still alleged. And I think if, talking about a pleading artifice, if that was enough to take a fundamentally excluded loss such as this and somehow plead into the coverage just by deleting a paragraph that says Plaintiff Incorporates paragraphs 1 through 38, that would be ridiculous. It would be the ultimate form over substance. Here, every single claim is premised on unexpected knowledge. Read these facts. Look at this back history, the number of claims, the number of secret settlements, the continuing involvement, boys staying overnight in his room, traveling the world with a teenage boy by his side. Look at these facts and say any rational adult wouldn't know what was going to happen with a known pedophile given unfettered access to children with no warning to the public, no warning to the members, no warning to the parents, letting him host youth camps and travel the world with kids. It is the essence of an expected injury. Are there factual distinctions between the wife in Westfield and the church here? Yes, of course, there's factual distinctions in any case. But the fundamental underlying principle of facilitating access to a known pedophile is exactly the same. Sure, they did put the little girl up on the lap, but they let boys stay overnight in his room. They let boys travel the world with him. They knew he was a pedophile and let him participate in these camps, didn't warn anyone, held him out as a priest in good standing repeatedly, despite having secretly and confidentially settled numerous cases against him and knowing better. And you'd have to check common sense at the door to say they didn't expect, they couldn't have reasonably anticipated exactly what happened, which is ongoing, repeated abuse. Well, having gone through the record and the briefs on this case, it seemed to me that the focus of the plaintiff's claim was the meeting initiated by Father Schlax in 1969, that that really is the focus of everything and not the world trips and other things that you're raising today. And if I look at the case from that perspective, it becomes very simple. The Jesuits denied the Father Schlax allegation. And let's say if there was a trial on that issue, there simply is no evidence that Father Schlax did or knew anything or the meeting didn't exist. There's no paper trail. And there ends up being a judgment on negligence counts and not on the other counts. Why don't you give coverage? And why don't you have a duty to defend at least up to that point? And you don't have a duty to defend because the facts as alleged on which liability are premised include those facts. I think you can always say an insured could defense a case. They could defense a case. The question is who's paying for that defense? We have contractually agreed to pay for a defense only if the claims alleged, so go back to the four corners of the complaint, if true, result in a covered liability under our policy. We're not saying if the insured disputes liability, we always have to defend. And I would be stunned if, as I said, every case cited in everyone's briefs where a duty to defend was discussed, the defendant didn't deny liability. That can't be enough to say you can't apply an exclusion because the classic eight corners analysis, it's the four corners of the complaint and the four corners of the policy. I understand in Pekin they had looked into a counterclaim, but in Pekin there was a specific issue also of self-defense, which I think as the Supreme Court said under the particular language of that policy, self-defense would naturally be raised in a counterclaim or a responsive pleading. And so to look to that I don't think is to say that a carrier can't defeat duty to defend on an exclusion because the defendant in answering the complaint denies liability. I think that the defendant denies liability is probably usually the case, but is irrelevant as to the liability coverage analysis because the liability coverage analysis, especially in an eight corner state like Illinois, is premised on if true. If the plaintiff's allegations are true, is there coverage? And here I understand the 1969 meeting, I think it was spelled out in detail because having seen a lot of these cases around the country through the years, the plaintiffs tend to focus on the specific meetings and things that they know they can specifically prove. There are absolutely allegations onward in that complaint that in the intervening years between then and when these victims were abused, which is primarily the late 80s, 90s, and into the 2000s, in those intervening years there had been other instances reported, there had been secret settlements reached, there had been an effort to move Father McGuire and conceal the allegations. These were all specifically pled in every complaint as well. So I understand that the 1965 to 69 Loyola time period is the jumping off point, but it's not the end all and be all. They do allege ongoing instances. And also that he was at Canisius House and there were young men living with him. Had boys there at Canisius House as well. And in light of the prior knowledge, and that's why I think to carve out this negligence count as a standalone doesn't fit. Are there other types of cases and other potential theories where that might work? Potentially. But not this case, not these allegations. Talk about a square peg in a round hole. This case is absolutely premised, even as amended and always from the start, even the negligence count, premised on the knowledge and the receipt of reports and purposeful and conscious conduct by the order moving Father McGuire around, concealing it, settling claims. That is facilitating the abuse every bit as much as the aunts facilitating the abuse in Westfield, it's just by a different vehicle. And just as the aunt had knowledge of the perpetrator's prior acts in Florida and Westfield, the order had knowledge of prior acts by Father McGuire in this instance. So yes, there are factual distinctions, but we think that the principles stated are on point and the case law is applicable. There was a discussion of the Diocese of Joliet case, and I want to address that briefly. The issue in that case was a number of occurrences, because there was an excess carrier that if they could put the loss in both years, wouldn't have owed anything. The question in Diocese of Joliet was not whether there was an occurrence. In Diocese of Joliet, if you read the facts carefully and look at this specific issue, of course, the allegation is that the diocese obtained knowledge of the father's relationship with the young girl in the second policy year, during 1986. And accordingly, there really wouldn't have been an occurrence-based offense under either year, given that there's an allegation of relationship in 1985 spilling into 1986. The diocese becomes aware of it during policy year two. So from that point forward, you may well be able to make an expected and intended type argument, but I believe that's one big distinction in diocese and perhaps explains why the excess carrier in that case was not challenging occurrence. And accordingly, I think an issue not addressed and not argued, a case can't be cited for authority to decide something that wasn't argued before it. And I think the facts of that case reveal the reason why. Firstly, an excess carrier wins anyway if he gets two years triggered. And second, the diocese learns of the abuse during year two, meaning there isn't a viable expected or intended offense under either year for defense purposes. And so that's the brief response on Diocese of Julia. I'm sorry, I know I'm talking kind of fast, but I had a fair amount to cover here. So I'm happy to... Your co-counselor. Yes, absolutely. I will hand over to Mr. Foody now to address some of the first non-profit issues. Obviously happy to answer any further questions. Thank you. Good morning. May it please the Court, my name is Richard Foody, and I represent First Non-Profit and Empire Insurance Company. I just want to raise one point with respect to the expected or intended. That exclusion is often referred to as the intentional acts exclusion, but that is very much a misnomer. It is the expected or intended injury exclusion. It has nothing to do with intended acts. It has to do with whether the injury is expected. And it's separated by a disjunctive, or you don't have to be intentional. If you can have expected injury, then that exclusion should be applicable. And I think that coincides very much with what counsel was saying just before me. Most of what I want to talk about, though, is Condition 1A in the First Non-Profit policy. What this condition essentially says is if Jesuit officials or superior employees of a perpetrator are informed of any allegations, even, of sexual abuse by that perpetrator, then there's no further coverage under the policy with respect to any later actions by that perpetrator. And there's no further coverage for anyone with respect to actions by him. So it's not illusory coverage. It still covers the Jesuits if anyone else is accused, but not if there's further actions by him. Now, it's interesting because in the first versions of 116, 117, 118, 119, and even in the amended version of 116, all the Father Schlack's story is included in every single comment. Father Schlack's reported to Loyola officials. Now, the Jesuits say, well, these aren't superior employees. These aren't officials. These aren't Jesuit officials. But, in fact, they don't have to be a Jesuit official. They just have to be a superior employee. It's alleged that at the time, Maguire was, in fact, a teacher at Loyola. Now, let's be real here. If you're a teacher at a school, who are your bosses? They're the principal, they're the president, or if you want to put it in terms of school districts, the principal, the district superintendent, and the dean, which are the three people who are alleged to have been attending that meeting. These are definitely Maguire's superior employees at Loyola. Which is a Jesuit high school. So it's clear that in 69, the Jesuits had prior knowledge of abuse, and therefore Condition 1A flat out applies. There's no way around it. Now, then they say, well, wait a minute. They're raising this specious argument that the pleadings were amended to somehow come within the scope of coverage. And they do that through the negligence counts in each of the amended complaints, or each of the following complaints, because 129 had not yet been pled, nor had 130. They're all by the same law firms. All of the same plaintiff's lawyers are involved. So what happened was, after Judge Agron granted us summary judgment, they said, well, how can we get around this? How can we amend this complaint so that we're not stuck with this summary judgment? So let's leave out the Father Schlack story. However, they couldn't leave it out intentionally, because, as you pointed out, they have to have notice for a negligent retention and a negligent supervision to apply. So instead they say, well, they moved from the 1960s of numerous instances, they being the Jesuits, and yet didn't do anything about it. Well, once again, they have notice, so Condition 1A still applies. Is there any kind of a respondee of superior claim floating around in the law cases? No. None whatsoever. And I understand you dispute that the principal and the president of Loyola Academy might be the right kind of supervisory officials to trigger that exception. No, we don't dispute that. They dispute your claim. But how do we get around the problem of the doctrine of Illinois law that says we should not, in a D.J. action, prejudge contested issues in the underlying litigation? Because what you have is a lot of Illinois law that says if an allegation in a complaint is true, and falls within a coverage provision that it borrows coverage, then you have to accept it for that purpose. So the fact that these people are denying allegations, the Jesuits are denying allegations, is of no moment in my interpretation of an insurance policy, because I have to look at the allegations of the complaint. Everyone denies allegations. You have to look at the allegations of the complaint, though. And if they are true, not saying that they are true, but if they are true and they fall within a coverage exception, then that exception is deemed applicable. That's how the courts have looked at it. Doesn't it get fundamentally simpler? In the absence of those allegations, no cause of action for negligence has been pled. Absolutely. The only thing you're left with are the intentional counts. Absolutely. You have to have those allegations in order to plead the cause of action of negligence. They must stay there. And if they're there, then your argument is you've got your exclusion. Absolutely. Absolutely. And they are there, even in the amended complaints. I take it on 117 you're contending it was outside your policy. Yes. And the Jesuits' reading of it basically throws the word infliction out of the policy. There has to be a sexual abuse or sexual molestation during the term of coverage. The definition of sexual abuse says the infliction of harm. Well, if you're inflicting the harm, by definition, that means you're doing an act. So here it's four years at least prior to when our coverage incepts. So, yes, very much so. I think there's another key point to make, and that concerns Pekin. And Pekin, of course, what the Pekin court says is, quoting Halliburton Root, it says, the trial court should be able to consider all the relevant facts contained in the pleadings. I mean, well, so you've got those allegations. Even if they left the Father Schlack story out of count two and didn't just say they knew about all these other instances, you have to read the Father Schlack story in. So 1A is still definitely applicable. Bear in mind also that that phrase that I just quoted was in italics. I didn't have those italics. In fact, the appellate court in Halliburton Root didn't have those italics. The Supreme Court had those italics. And they said you have to look at all the relevant facts that are alleged. Well, the Father Schlack story and all these secret settlements are certainly relevant facts, and they all predate any of the abuse in any of these cases, including in the parents. So for all of these matters, there should be no coverage. With respect to the parents, there's no sexual abuse raised with respect to them. They say the kids were sexually abused. They don't say they were sexually abused. They said they lost their faith in the church, certainly in the Jesuits. That's not sexual abuse. Even if there was 1A not being applicable to the parents, which I think it still is because they still raise the prior allegations of knowledge, then they also allege that the Jesuits are this renowned religious organization, religious personnel, ministers, priests, et cetera, are deemed professionals. And there's an exclusion in our policy that says if you're conducting a professional service, then we're not providing coverage for you. So on that basis, we feel that there is no coverage. There's no coverage under the Empire policy for the reasons that were discussed previously by counsel. And I'll leave it up to you. Unless you have questions, I'll leave it up to Penn General to put in place.  My name is Ashley Conahan, and I represent the Appellee Pennsylvania General Insurance Company. Given that the expected or intended exclusion and occurrence issue has already been argued, I want to spend my brief time talking about the issues that are unique to Pennsylvania General, namely the pastoral counseling professional liability endorsement and also the policy issue. Can I derail you a little bit? Where's your policy? Of course. Your Honor, we have attached all of the relevant portions of the policy that have been available to Pennsylvania General. The Jesuits have not produced any other policy forms or coverages in response to the summary judgment motion. They simply claim that there might be some other form out there. However, all of the forms have already been produced. Illinois has cases that say in the absence of the entire policy, you're not entitled to summary judgment because the entire policy has to be reviewed. Well, Your Honor, the Pennsylvania General has met its burden to show that coverage is excluded by the terms of the policy. But how do we know if there are other exclusions out there? By providing the relevant portions of the policy to allow the court to make a coverage determination that there is no coverage and it is excluded. And the Jesuits have not come back to show that it's their burden, that it falls within some sort of grants of coverage. Well, they have no burden unless and until you produce facts which, if true, entitle you to judgment as a matter of law. They can sit on their hands and they win. So the question becomes, can you ever win one of these summary judgments without producing your entire policy? And you say yes, but there are cases that say no. Your Honor, respectfully, all of the relevant provisions of the policies and all of the documents that Pennsylvania General has were attached to the summary judgment motion, and these are the actual policy provisions that were issued to the Jesuits. It is not some sample form that might have been issued at the time that was available and is unlike the Wilfred's case. But do we have to accept your premise that all the relevant provisions are before us? Well, Your Honor, they produced no evidence to the contrary and did not dispute the affidavit. It's not their burden. They did not dispute the affidavit and create a question of fact with that, but rather claim that there was just some missing form out there without producing evidence to the contrary. How do you get around Wilfred's? How do you get around Wilfred's? Well, Your Honor, in Wilfred's, what the affidavit was is that the underwriting file was missing and that they produced forms that were generally issued at the time that the policy was issued to the insured in Wilfred's. Whereas in this case, our affidavit shows that it's the actual policy provisions that were issued to the Jesuits that were enclosed, and in fact, looking at the policy materials themselves, is that it is the declarations and schedule policy forms that were produced and show that the commercial general liability and the pastoral counseling endorsement form were in fact included in the issue to the Jesuits. Therefore, it is not like the Wilfred's case at all. Since this division ruled on the first appeal in this case, which was an appeal basically limited to the issue of the missing policy provisions, has anything changed in the record with respect to portions of this policy being discovered that would require us to change our original decision? Your Honor, as you may recall from the initial appeal, we had actually initially tried to get the appeals consolidated, and the Jesuits opposed this and this was denied, hence why we had this sort of prior appeal issue. Since the remand, it's been in discovery in the underlying case, and as far as we know, formal responses have not yet been submitted, is that there are no other policy provisions that the Jesuits have provided. We have also subpoenaed the Jesuits' agent for documents, and there have been no other policy provisions that have been produced there. Thus, there's no new forms that have mysteriously come out. We're still dealing with the same policy provisions, the same general liability provisions, and the same pastoral counseling professional liability provisions, which I would like to point out that they don't dispute that these are a part of the policy. They don't claim that the pastoral counseling professional liability coverage is not part of the policy. They in fact contend that there is coverage, even though there is not, because there's no pastoral counseling activities, and saying that they don't numerally contend that the expected or intended exclusion doesn't apply. Their position is just that there's perhaps some other form that may provide coverage, but they have no evidence to create an issue of fact on that to preclude summary judgment, and it is appropriate to issue a substantive ruling in this case for Pennsylvania general. And if I may go into briefly the pastoral counseling liability. Before you get to that, let me just wrap up one question here. Again, on the issue of the missing policy provisions, how do you get around law of the case? I mean, we seem to be re-arguing something that was already argued and decided by this division. Yes, Your Honor. So we're stuck with what we already decided, aren't we? Well, first off, we do not believe it was not a final order. It was not an adjudication on the merits, and respectfully believe that the Rule 23 order was issued without any oral argument and without any opportunity to explain how this case is not like Wilfred's and how we are dealing with the actual provisions. Whoa, whoa, whoa. Let's slow down. We decide what oral arguments are appropriate. The parties don't. Oral arguments are for our benefits, not for yours. So the fact that we didn't have oral arguments or decided it without oral arguments doesn't affect the razor-to-cutter effect or the estoppel effect of a judgment we enter. Why isn't it final? Your Honor, we understand that. We respectfully acknowledge that you issued the Rule 23 order on that narrow policy issue. However, it is our contention that, given that it's the same policy form still at issue in this case and that there are no new developments, that a substantive ruling is not prohibitive on the issues in this appeal. And, Your Honors, briefly, there is no coverage on the pastoral professional liability endorsement, which is unique to the Pennsylvania general policy, because the claims in the John Doe parent suit do not concern pastoral counseling activities. Simply, the sexual abuse is not a pastoral counseling activity, and the Jesuits are not being held liable for their pastoral counseling activity but for their negligent retention and supervision of McGuire, which is an administrative act and does not require any specialized knowledge, skill, or training as a pastoral counselor and is an administrative act much like the American Mutual Insurance Company versus Enright case. Thus, for those reasons, there is no coverage on the pastoral counseling liability endorsement, and the trial court's decision should be affirmed. Thank you, Your Honors. Thank you. Rebuttal? Very briefly. Just on the last points that Pennsylvania general made, you asked whether or not the court had to accept the representations that all the relevant policy terms have been provided. The answer to that is no. I also want to briefly point out, apparently there was a suggestion that I might have somehow waived this policy form issue by including, you know, I'm saying there's, you know, I'm making arguments about that there is coverage under the pastoral counseling professional liability coverage. I specifically in our brief said, you know, that I'm kind of in a catch-22 here. We have the policy forms issue, and specifically noted in the brief that I was not at all by putting that language in my brief waiving any issue with respect to the policy forms issue. I also want to point out, you know, there was a point mentioned about, you know, that we opposed consolidation of the underlying case. We weren't the only ones that did. Actually, First Nonprofit did too. This might be a moot point, but the other case had just gotten so far along. The Jesuits had already compiled the record. That was just as lengthy in that case as what it is here. The Jesuits had already filed their opening brief. Pennsylvania general blew through all their extensions of time, and then, you know, wanted to all of a sudden consolidate these two appeals, and we said no, and so did several other appellees. So that was why that happened. I would submit this issue on the policy forms has been decided. It's been litigated. There is nothing new in the record at all that should cause the court pause or to change its decision. The information I have is that discovery hasn't started, actually, in that remanded case. Nobody's exchanged anything, and so we have – that's why we – there's no new information at this point. I have to address – I feel compelled to address a couple of things about the arguments on Condition 1A by First Nonprofit's attorneys. They misquote their own policy. The condition talks about if a Jesuit executive officer, supervisory employee, trustee, or director has actual knowledge. They're up here talking about Jesuit superior employees and officials, and officials is the word that appears in the underlying complaints, but importantly, with respect to all those allegations about the meetings back in 1969 and John Doe 84, what it says is that John Doe 84 told Father Schlax. Father Schlax, a Chicago Archdiocesan priest, went and told the order and Loyola Academy officials. Then there's a meeting. The president, the headmaster, and the principal of Loyola Academy were there. We don't know what ranking any of those people have within the Jesuit organization. It's not alleged, and in order for First Nonprofit to argue that the condition applies – They can't? You have an argument that they are not supervisory employees of McGuire at the time, a teacher at Loyola Academy? It's supervisory employees within the – it's within the Jesuit organization. They might have held prominent positions at Loyola Academy. That doesn't mean they hold prominent positions within the Jesuit organization or that they're in the upper echelon of the Jesuit rankings. We don't know because it's not pled, and in order for them to get there, they have to add substance to the underlying complaints that isn't there. That's our argument on Condition 1A. And I have to say – Who else would it be, then? Well, again – Are you talking about the Midwest Provincial or somebody like that? I understand. Under the rubric of complaints are read liberally in favor of coverage and the like, those kind of axioms that we have in Illinois, I just don't think it's too – I think they're embellishing. I mean, all through their brief, it's high-ranking Jesuit officials knew about this. That's their words, not the John Doe claimant's words. Okay, let's just look at supervisory employee. I mean, the complaints are really clear as to who it was that was in that meeting. The principal, the headmaster, and – The dean or something, right? Correct. Correct. Who else could they have pulled out of that academy that would be considered the supervisory employee? I understand Loyola Academy was run by the Jesuits, or it's a Jesuit high school then, but again, I still think you have to put something, some substance in that complaint, these underlying complaints that isn't there in order to say that Condition 1A invalidates coverage for the Jesuits perpetually for all these claims. And I have to address this notion that this negligence count can't stand on its own without these actual knowledge and the meeting allegations back in the 1960s. The elements of negligence, duty, breach, proximate cause, damages, it doesn't involve anything about intent or expectation. Obviously, if – and this has been brought up today – How do you get the duty? If there isn't proof of – well, because it's not about – it's not – if somebody said, well, duty to warn of what? Duty to protect from what? What they're claiming the Jesuits did negligently is supervise. Negligently supervise, negligently retain. Okay, you've got, in this factual context, the Jesuits are headquartered in Chicago, you've got a priest traveling all around the world doing horrendous things that he shouldn't be doing, and, you know, he's just able to do all that. I mean, none of that has to – none of that – that kind of a claim doesn't mean there has to be proof that the Jesuits had actual knowledge of bad acts by him or prior bad acts. You know, I'm not trying to carve out the negligence count. We've also been accused of that. I can't erase these actual – How could they foresee the harm that resulted without having knowledge of at least facts? Well, it wouldn't have to necessarily be actual knowledge. It could be a constructive notice type of argument, something less than intent, something less than expected, but it doesn't have to be that – I disagree with the notion that the negligence counts can't stand on their own or are entirely reliant upon that subset of allegations of actual knowledge in the complaints. If the underlying claimants can't prove actual knowledge, the fallback position is negligence. That's clear. They pled it. And, again, those negligence claims trigger the duty to defend, take this case out of this realm of this exclusion. And in Illinois especially, where the duty to defend exists as long as there's a possibility that a claim might trigger coverage and that we've got to read complaints liberally in favor of coverage and that when you've got covered counts and non-covered counts, the duty to defend still exists, I submit the summary judgments have to be reversed on the duty to defend issue. I appreciate the Court's time today. Thank you very much. Thank you, Counsel. Counsel, thank you. The matter will be taken under advisement. Court is adjourned.